<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PAMELA LEWIS,<br><br>       Plaintiff,<br><br>       v.<br><br>CABLEVISION SYSTEMS CORPORATION,<br><br>       Defendant. | Civ. No.  08-2793 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

The Marchese Law Firm, LLC
by:  Daniel Gerard Petoia Marchese, Esq.
93 Spring Street, Suite 300
Newton, NJ 07860

    *Attorney for Plaintiff,*

Morgan Lewis & Bockius
by:  Michelle Seldin Silverman, Esq.
502 Carnegie Center
Princeton, NJ 08540

    *Attorney for Defendant.*

**<u>DEBEVOISE, Senior District Judge</u>**

      The dispute underlying this matter arose from the Plaintiff, Pamela Lewis's application for employment as a business analyst with Defendant, CKC TKR, Inc. (a wholly owned subsidiary of Cablevision Systems Corporation) ("Cablevision").  The Business Controls Manager, Paul Crane interviewed Lewis but hired another applicant for the job.  Lewis, an African-American woman, claims that Cablevision's failure to hire her was motivated by race and sex discrimination.  She seeks compensatory and punitive damages for alleged violations of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the New Jersey Law Against Discrimination ("LAD"). Cablevision now moves for summary judgment, pursuant to Fed. R. Civ. P. 56, on all four of Lewis's employment discrimination claims. After reviewing the arguments of both parties, the Court finds that Lewis's allegations of discrimination premised on Title VII and § 1981, Counts Two and Three, even when viewed in the strongest possible light, are not supported by any evidence that Crane was motivated by retaliatory or discriminatory animus when he hired another applicant instead of Lewis. As for Counts Three and Four, the Court finds that Lewis has not adduced any evidence that she was terminated from her prior position with Cablevision in a discriminatory fashion or that she engaged in protected activity or was retaliated against for such activity. Therefore, Cablevision's motion for summary judgment will be granted and Lewis's Complaint will be dismissed in its entirety.

## I.  BACKGROUND

Lewis filed the Complaint on June 5, 2008. The Complaint stated four claims: (1) and (2) for failure to hire based on race discrimination in violation of § 1981 and sex discrimination in violation of Title VII; (3) unlawful termination on the basis of Lewis's sex or race, in violation of New Jersey LAD, N.J. Stat. Ann. § 10:5-1, et seq.; and (4) a claim for retaliation. Lewis seeks compensatory damages for the severe emotional distress, embarrassment, humiliation, and loss of self-esteem, loss of earnings, loss of future earning power, loss of back pay, front pay, and interest, and punitive damages. Discovery was due on September 27, 2009. On December 18, 2009, Cablevision filed the present motion for summary judgment. The Court held oral arguments on the motion on February 16, 2010.

Lewis began her career as an Accounting Clerk at First Fidelity Bank in 1990. (Lewis Dep. 9:2-4, July 7 and Oct. 27, 2009.) As an Accounting Clerk, Lewis worked on "reclamations,

returning government payments…on deceased customers" and processed a daily ledger.  (Id. 86:7-16, 87:13-18.)

Cablevision hired Lewis as a Customer Relations Coordinator at the Newark Call Center ("Call Center") in February 1995.  (Id. 15:6-10.)  At the time, she did not have a college degree.  As a Customer Relations Coordinator, Lewis handled telephone calls from Cablevision's customers about service and repair issues.  (Id. 15:11-17.)  In March 2003, Cablevision promoted Lewis to a Traffic Coordinator position.  In that capacity, she monitored the performance and operations of the Call Center.  (Id. 74:12-75:7.)  Cablevision helped Lewis pay for college courses, and in May 2003, she earned her Bachelor of Science in Accounting from Kean University.  She received a Masters degree in Accounting in May 2007.  Lewis did not work as an accountant at Cablevision and she does not have a Certified Public Accountant ("CPA") Certificate.  (Id. 15:6-17, 24:3-7, 74:12-75:7.)

In or around September 2003, Lewis applied for a Staffing Analyst position in the Business Controls Department of the Call Center.  (Id. 168:4-15.)  Paul Crane manages the Business Controls Department and is responsible for hiring in the Department.  (Crane Dep. 8:20-24, 15:14-17:11, August 13, 2009.)  Crane interviewed Lewis for the Staffing Analyst position.  Crane did not select Lewis for the position; instead, he offered it to another African-American woman.  (Crane Cert. ¶ 2.)

Lewis applied for two accounting positions at Madison Square Garden ("MSG"), an independent division of Cablevision, in July and October, 2004.  (Lewis Dep. 85:24-86:6.)  Those positions required a minimum of two to three years of public accounting experience and stated a preference for CPA certification.  (Mustillo Cert. ¶ 3.)  MSG did not select Lewis for an interview because she was not qualified and because stronger candidates were indentified.  (Id. ¶

3

4.) Subsequently, Lewis emailed an MSG Human Resources employee, Lynn Carfora, to further inquire about the positions and to "express [her] concerns…about not qualifying for an interview for the…Accounting…position." (App. F to Silverman Cert.) Carfora replied with an invitation to visit MSG "on an exploratory basis" to meet with an MSG recruiter, Lisa Mustillo. (Id.) In late November, 2004, Lewis visited MSG to meet with Mustillo. (Lewis Dep. 82:2-21, 107:7-111:16.) MSG did not offer Lewis either job of the two jobs.

Lewis subsequently spoke to Ann Marie Mayeski, the Director of Administration at the Call Center, about not qualifying for the positions at MSG. (Id. 172:16-173:3.) Lewis told Mayeski that she wished to move into a "business" position at Cablevision. (App. D to Silverman Cert.) Mayeski informed Lewis that she was not aware of any available entry-level accounting positions within the Company, and that as a general matter, Cablevision receives applications from many experienced candidates for every job opening. (App. H to Silverman Cert.) Mayeski suggested that Lewis might consider looking outside of the Company to gain the entry-level work experience necessary for the types of accounting positions she desired. (Mayeski Dep. 34:9-25, Oct. 14, 2009.) Lewis had a "wonderful relationship with…[Mayeski]." (Lewis Dep. 104:22-105:2.)

In September, 2005, Lewis accepted a position with the City of Newark as a grant accountant. She considered the position a promotion and accepted the job with the intention of building her accounting experience. (Id. 23:19-24, 87:19-88:13, 166:20-167:12.) On September 15, 2005, Lewis gave Mayeski her voluntary notice of resignation from her job as a Traffic Coordinator with Cablevision, effective October 15, 2005. (Lewis Dep. 176:6-14.) Before Lewis left Cablevision, she had an exit interview with Human Resources employee Stacey Aster. (Lewis Dep. 164:19-24.) There is no evidence that Lewis ever complained to anyone at

Cablevision or MSG about discrimination based on her race or sex regarding her employment with the company from 1995 to 2005.

Lewis started work as a grant accountant at the City of Newark on November 14, 2005. She found the work overwhelming. (Id. 24:24-25:11, 25:15-22.) In July 2006, at which point she had been working for the City as an accountant for approximately eight months, Lewis applied for a Business Analyst position at Cablevision. (App. D to Silverman Cert.) The posting for the position, under the heading "Qualifications," stated:

> Bachelor degree in Accounting or Finance is required. Commencement of Master's Degree in related discipline is a plus. Three to five years Accounting or Finance experience, preferably within the cable television or a related industry. Strong analytical and logical skills required. Ability to work under pressure in a fast0paced [sic] environment in an individual or team basis. A strong desire to learn. Strong knowledge of Microsoft Excel is required. Familiarity with Microsoft Word and Hyperion is a plus.

(App. D to Mayeski Cert.) The Corporate Compensation Department of Cablevision sets the minimum requirements for all the positions at Cablevision, including the Business Analyst position. (Mayeski Dep. 29:21-30:10.) Additionally, Crane, who interviewed all the candidates and was the only person responsible for the hiring decision, stated that he was looking for someone with a Master's in Business Administration ("MBA") and at least three to five years doing the work of a Business Analyst. (Crane Dep. 50:23-51:16.) He wanted someone with an MBA because he holds an MBA and believes from personal experience that one "learn[s] a lot of skills in getting your MBA that would translate into this job; namely, you get tons and tons of data, summarizing it, analyzing it." (Id. 71:14-72:3.)

Crane has hired eight people for nine positions since working at Cablevision, including two African-American females, two White males, a Hispanic male, a White female, a Hispanic female, and a non-White female. (Crane Dep. 44:19-47:11.) Although Lewis never worked

directly under Crane during her time at Cablevision, the two knew each other and interacted professionally on occasion. (Lewis Dep. 39:6-45:13.) Lewis liked Crane "very much," believed that he treated her "very fairly," and that he wanted her to succeed. (Id. 89:12-16.)

Santanya Nelson, a Human Resources Recruiter, was responsible for posting the Business Analyst position on the internet. She collected the resumes that were submitted, examined them, and called candidates in for interviews. For the Business Analyst position, Nelson administered an Access and Excel test before conducting an initial interview. (Nelson Dep. 44:12-45:2, October 14, 2009.) Candidates then met with Nelson for initial interviews of 45 to 75 minutes, during which she inquired about the candidates' work history and outlined the expectations of the position. (Id. 18:2-19:12.) Thereafter, she selected some candidates to interview with Crane and some were not granted additional interviews. Cablevision's staffing protocol requires that Recruiters like Nelson "use his or her best judgment based on the site to identify the candidate's ethnic ID and record it" on the Applicant Tracking System, absent a declaration of ethnic origin on the applicant's paperwork. (App. 1 to Marchese Cert.)

Nelson granted Lewis an initial interview because she had previously worked in the Call Center and had Cablevision call center experience. (Nelson Dep. 56:15-21.) Lewis passed the Access and Excel tests. Nelson did not believe that Lewis had the required analysis experience for the job, but she allowed Lewis to continue to the interview round with Crane "as a courtesy" because she was a former employee. (Id. 56:15-59:17.)

Crane interviewed two rounds of candidates for the position. During the first round, he interviewed Chris Pacheco, Lewis, and others. (Crane Dep. 50:6-9.) Crane did not believe that Lewis was qualified for the job because she did not have an advanced degree or any type of financial analysis-type work. (Id. 50:23-51:7.) Additionally, he remembered that during the

6

interview he had the impression that she did not possess some of the technical skills required for the position. (Id. 54:18-20.) Pacheco had five years of experience working as a Financial Analyst and was in the process of earning his MBA. (App. E to Mayeski Cert.) Crane offered the job to Pacheco because he believed he was the most qualified person in the first pool of candidates. (Crane Dep. 24:1-7, 48:24-49:16.) Pacheco turned down the job offer so Crane interviewed a second pool of candidates. (Id. 24:5-7.) After the second round, Crane selected Patrick Neufeld, who had more than three years of relevant experience and had earned an MBA. (Neufeld Dep. 11:7-13:25, 63:12-25, August 13, 2009.) Lewis believes she should have been selected for the job because she had years of service with Cablevision and experience working in the Call Center. (Id. 163:10-20.)

Lewis left her position with the City of Newark on May 29, 2007 to accept a Grant Accountant position with the New Jersey Institute of Technology ("NJIT"). (Lewis Dep. 23:5-13, 24:11-25:11.) Lewis considers her job with the NJIT to be another step up. She makes more money, considers it a better career opportunity, and feels that in comparison with the City of Newark, NJIT is a more professional environment. (Id. 24:15-25:11.)

## II.   DISCUSSION

The principal issues presented by this motion are whether Lewis has adduced any evidence that Cablevision took an adverse employment action against her based on a discriminatory motivation or in retaliation for any protected activity. The Court has federal question jurisdiction over the Title VII and § 1981 claims based on 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 over the New Jersey LAD claims because all of Lewis's claims arise from a common nucleus of operative fact.

**A.    Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      Counts One and Two:  Discriminatory Failure to Hire in Violation of Title VII and § 1981**

Counts One and Two of the Complaint allege that Cablevision discriminated against Lewis in its failure to hire her based on her race and/or sex, in violation of Title VII and § 1981. Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Similarly, § 1981 prohibits discrimination against an applicant for employment because of the person's race.  To succeed on her claims, Lewis must show that Cablevision failed to hire her and her race or sex was a determinative factor in Cablevision's decision.

The Court's task is not to second-guess employment decisions.  Rather, the Court must determine whether the employment decisions were motivated by an illegal discriminatory purpose.  In analyzing claims for race and gender discrimination under both statutes, where, as here, the plaintiff has not alleged any direct evidence of discrimination, courts apply the three-step burden shifting analysis adopted by the United State Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792 (1973) and clarified in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Under the burden-shifting framework, the initial burden is on the plaintiff to make out a prima facie case by showing (1) that she belongs to a protected class; (2) that she was qualified for the position for which she applied; (3) that despite being qualified, the employer rejected her application; and (4) that after this rejection, the position remained open and the employer continued to seek candidates with qualifications similar to the plaintiff's to fill the position.

McDonnell Douglas, 411 U.S. at 802.  Once the plaintiff presents a prima facie case of discriminatory hiring, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for not hiring the plaintiff.  Id.

If an employer presents a non-discriminatory reason for the decision not to hire, the burden shifts back to the plaintiff to "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  The plaintiff must submit evidence that the explanation is pretextual—i.e., evidence that would cause a reasonable factfinder to disbelieve the employer's articulated reason, or believe that an invidious discriminatory reason was more likely than not a determinative factor in the employer's action.  Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994); Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000).  Because the ultimate issue is whether discriminatory animus motivated the employer, it is not enough to show that the employer made a wrong or mistaken decision.  Id. at 765.  Rather, the plaintiff must uncover "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation that would allow a reasonable factfinder to believe that the employer did not truly act for the asserted reason.  Id.  While the McDonnell Douglas framework shifts the burden of production, the burden of proof remains at all times with the plaintiff.  Burdine, 450 U.S. at 253.

Lewis has failed to make out even a prima facie case of discriminatory failure to hire.  The first element is not disputed; Lewis is an African-American woman so she is a member of protected classes based on her race and sex.  In regard to the second element, Lewis has failed to establish that she was qualified for the position.  Lewis argues that the fact that she was called in for an initial interview with Nelson and subsequently invited for a follow-up interview with

Crane constitutes proof that she was qualified for the job. However, an invitation to interview does not necessarily mean that a candidate is qualified. In fact, in this situation, the undisputed facts show that Nelson selected Lewis for an initial interview and later for an interview with Crane as a courtesy since Lewis was a former employee.

As for the third element of the prima facie case, Lewis has failed to establish that after rejecting her, Cablevision continued to seek out candidates with qualifications similar to hers. The position did remain open and Crane continued to interview more candidates. However, Crane was seeking candidates who were more qualified than Lewis. Lewis asserts, without explanation, that "one of [the candidates to whom Cablevision offered the Business Analyst job] had similar qualifications to" hers. (Pl. Opp'n Br. 10.) However, the undisputed facts bring the Court to the opposite conclusion as a matter of law. Lewis had eight months of accounting experience and had not even begun to take classes towards an advanced degree. She did not have any financial analysis-type work experience. On the other hand, Pacheco was in the process of earning his MBA and had five years of experience in financial analysis; Neufeld had more than three years of relevant experience and had already earned an MBA. No reasonable jury could conclude that Lewis's qualifications were equivalent to those of Pacheco and Neufeld. Lewis has failed to make a sufficient showing for the second and third elements of a prima facie case of discrimination based on race or sex. On that basis alone, the Court must dismiss her claims.

Even assuming Lewis had successfully established the elements of a prima facie case of discriminatory failure to hire, she would not automatically prevail. Rather, the burden of production would simply shift to Cablevision to offer a non-discriminatory explanation for its failure to hire her. Cablevision would have to "clearly set forth, through the introduction of

11

admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 254-55 & n.3) (internal quotations omitted).

 Crane, the sole decision-maker, stated that he did not hire Lewis because he did not believe she was qualified for the job since she did not have an advanced degree or any type of financial analysis-type work experience. Additionally, her interview had given him the impression that she did not possess some of the technical skills required for the position. Crane was searching for someone who had worked for three to five years as a business analyst and ideally held an MBA. Lewis's background clearly does not meet those standards. She had only eight months of accounting experience and no experience with financial analysis, and neither held nor had begun coursework towards an MBA degree. Lewis simply did not possess the qualifications preferred by Crane and stated in the job description. Cablevision has met its burden of producing evidence that it had a legitimate, non discriminatory reason for not hiring Lewis.

 The burden of production now shifts back to Lewis. To defeat summary judgment on her claims, Lewis must produce sufficient evidence to allow a reasonable fact finder to conclude that the proffered evidence for not hiring her was a pretext for illegal discrimination. She has not produced evidence that could cast sufficient doubt on the legitimate reasons Crane offered, nor has she produced evidence that would allow a jury to infer that discrimination was a determinative factor in Cablevision's decision not to hire her.

 Lewis attempts to attack the plausibility of Cablevision's proffered reason by asserting that she should have been selected because she had years of service with Cablevision, accounting experience, and experience working in the Call Center, and she passed the Excel and Access

12

tests.  She offers only her subjective opinion that she was qualified in support of these assertions.  However, as the Court determined above, no reasonable jury could find that Lewis's work experience and background qualified her for the job.  Although she may have had some desirable characteristics, such as familiarity with the company's business and some accounting experience, she simply did not have the years of finance analysis and level of education the company wanted.

Lewis asks the Court to regard Crane's preference for a candidate with an MBA as a pretext for discrimination because Crane's preference differs from the posted job description, which stated "[c]ommencement of Master's Degree in related discipline is a plus."  However, it is not for the Court to second-guess Crane's hiring criteria.  Crane offered a business-related explanation for his preference for an MBA candidate—he stated that a person "learn[s] a lot of skills in getting [his or her] MBA that would translate into [the Business Analyst] job; namely, you get tons and tons of data, summarizing it, analyzing it."  (Id. 71:14-72:3.)  In any case, the factual dispute at issue is not whether Crane's hiring criteria was "wise, shrewd, prudent or competent."  See Fuentes, 32 F.3d at 765.   Rather, the question is whether there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons."  Id. (internal quotations omitted) (emphasis in original).  Lewis has not raised any evidence that would allow a reasonable jury to find that Crane's reasons were inconsistent or otherwise unworthy of credence.  Crane applied his hiring criteria in a uniform manner and the criteria itself was rooted in a rational business decision.

Lewis presented evidence that the two candidates to whom Crane did offer the job were white men and that the Human Resources Department collected information about applicants'

ethnicity for its hiring data. Both of these arguments are insufficient to support an inference that racial discrimination was a determinative factor in Cablevision's decision not to hire her. First, a reasonable jury could not infer that Crane's hiring decision was tinged by discrimination solely based on the fact that the two candidates Crane hired happened to be white men. Additionally, Crane has a long record of hiring racially diverse candidates for positions at Cablevision.

Second, the Human Resources Department's collection of information about applicants' ethnicity does not support an inference of impermissible motivation. The staffing protocol requires that Cablevision Recruiters like Nelson "use his or her best judgment based on the site to identify the candidate's ethnic ID and record it" on the Applicant Tracking System, absent a declaration of ethnic origin on the applicant's paperwork. There is no evidence, however, that Crane had access to the hiring data, or that it in any way affected his decision not to hire Lewis. Furthermore, Cablevision asserts that it gathers information about the racial make-up of its applicant pools because as a contractor that does business with the federal government, it is required to do so by Department of Labor's Office of Federal Contract Compliance Programs.

Lewis simply has not provided the Court with evidence from which a reasonable jury could infer that racial discrimination shaped Cablevision's decision not to hire Lewis. The Court will grant summary judgment on Lewis's claims under § 1981 and Title VII, Counts One and Two.

## C.    Count Three: Discriminatory Termination in Violation of the Law Against Discrimination

Count Three of the Complaint alleges that Cablevision illegally terminated Lewis on the basis of her race and/or gender in violation of the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5-1, et seq. Lewis appears to have abandoned Count Three, since

she did not address LAD at any point in her opposition papers. Even if she has not, however, the undisputed record demonstrates that summary judgment for Cablevision is appropriate on this claim.

LAD states that it shall be "an unlawful employment practice…or…unlawful discrimination…[f]or an employer, because of race, creed, color, national origin…to discharge…from employment such individual or to discriminate against such individual." N.J. Stat. Ann. § 10:5-12. Lewis's claim for discriminatory termination must fail because Lewis stated that she voluntarily resigned from her job with Cablevision in September 2005 to accept a position with the City of Newark as a grant accountant. There is no evidence that Cablevision terminated Lewis at any point, let alone terminated her based on an illegal motive. The Court will dismiss Count Three of the Complaint.

### D.   Count Four:  Retaliation

Count Four of the Complaint alleges that Cablevision retaliated against Lewis for engaging in a protected activity. Lewis appears to be alleging that she was not hired for the Business Analyst position because of some protected activity she engaged in before she left Cablevision. Lewis appears to have abandoned this claim as well, since she did not address it at all in her brief. As the Court cannot discern any evidence that Lewis engaged in a protected activity, summary judgment will be granted in favor of Cablevision.

The Complaint does not indicate whether Count Four is brought under Title VII or LAD. Nevertheless, the courts analyze claims for retaliation under both statutes in the same manner, applying the burden-shifting framework set forth in McDonnell Douglas, 411 U.S. at 792. In the context of a claim for retaliation, a plaintiff's prima facie burden is to show that: (1) she engaged in protected activity; (2) the employer took adverse action at the time, or after the

15

protected conduct took place; and (3) there is a causal connection between such activity and the employer's actions.  See Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).  Protected activities include:  (1) opposing any practice made unlawful by Title VII; (2) making a charge of employment discrimination; (3) testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII.  42 U.S.C. § 2000e-3.  In order for a complaint to management to qualify as protected, it must have been specifically related to a practice made unlawful by Title VII.  In the context of retaliation in relation to an age discrimination claim, the Court of Appeals for the Third Circuit ruled that a letter complaining about unfair treatment in a general manner was not protected activity where the employee did not specifically complain about age discrimination in his letter.  Barber v. CSX Distrib. Servs., 68 F.3d 694, 701 (3d Cir. 1995).

    Lewis met with Carfora, an MSG human resources employee, and with Mayeski, the Director of Administration at the Call Center, to express her concerns about not qualifying for jobs she applied for at MSG, an independent division of Cablevision.  However, Lewis has offered no evidence that during those or any other discussions, she ever mentioned any concerns about sex or race discrimination.  Thus, Lewis's complaints do not qualify as protected activity because she did not specifically complain about discrimination.

    As for the remaining elements of a prima facie claim for retaliation, Lewis has not presented any evidence that there could have been a causal connection between any activities during her previous tenure at Cablevision and Crane's decision not to hire her for the Business Analyst position in 2006.  There is no evidence that Crane knew of any of the complaints Lewis made.  Count Four for retaliation will be dismissed.

## II.  CONCLUSION

      For the foregoing reasons, the Court will grant summary judgment to Cablevision on all of Lewis's claims.  The Court will dismiss Counts One and Two because no reasonable jury could find that Crane's stated reason for not hiring Lewis—that she was not qualified—was actually pretext for a discriminatory motive.  The Court will dismiss Count Three because Lewis resigned and was not terminated from her job at Cablevision in 2005.  The Court dismisses Count Four because Lewis has not adduced evidence that she engaged in protected activity.  The Court will enter an order implementing this opinion.

                                                  **s/ Dickinson R. Debevoise**
                                              DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: March 22, 2010